HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JAMES M. BLAIR - Pro Se,

        Plaintiff,

    v.

ALASKAN COPPER AND BRASS CO.,

        Defendant.

Case No.:  C07-1877RAJ

[PROPOSED] FINDINGS OF FACT
AND CONCLUSIONS OF LAW AND
DIRECTION FOR ENTRY OF
JUDGMENT

[*Clerk's Action Required*]

      This matter came on for bench trial beginning Monday, April 27, 2009.  Plaintiff James Blair appeared *pro se*.  Defendant Alaskan Copper & Brass Co. ("Alaskan Copper") was represented by Brendan Monahan of Stokes Lawrence, P.S.  At the close of Mr. Blair's case and following three days of testimony, Alaskan Copper moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c).  Being fully advised, the Court granted Alaskan Copper's Rule 56(c) motion.  Findings of Fact and Conclusions of Law are as follows:

## I.  FINDINGS OF FACT

### Background

      1.      Alaskan Copper is a Seattle-based metal materials supply business.  The Company fills orders from a warehouse in Renton, Washington.  Mr. Blair was hired to work in the Renton warehouse on May 9, 2006.  Mr. Blair was terminated by Alaskan Copper on December 18, 2006.

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW AND
DIRECTION FOR ENTRY OF JUDGMENT - C07-1877RAJ

2.      During the course of his employment, Mr. Blair filed two EEOC Charges.  The first alleged race discrimination and hostile work environment.  The second alleged race and age discrimination, retaliation and hostile work environment.  Following his termination, Mr. Blair filed a third EEOC charge which alleged race and age discrimination, retaliation and hostile work environment.  All three charges were dismissed by the EEOC.

3.      Following his termination, Mr. Blair filed a labor grievance to contest his termination.  He was represented by his Union in the arbitration hearing.

4.      Subsequently, Mr. Blair filed this lawsuit.  He alleged race and age discrimination, retaliation, hostile work environment and "whistleblowing."  Alaskan Copper moved for summary judgment.  Dkt # 54.  On April 9, 2009, the court dismissed Mr. Blair's age and whistleblowing claims and found that remaining claims survived "by the thinnest of margins" based upon inferences in favor of Mr. Blair that were required by Federal Rule of Civil Procedure 56.  Dkt # 85.

5.      The Court conducted a bench trial on Mr. Blair's remaining claims, which were race discrimination, retaliation and hostile work environment.

### Mr. Blair's Employment, Discipline and Termination

6.      When Mr. Blair was hired at Alaskan Copper, he was assigned to work the second shift in a crew of 11 employees under the supervision of Kevin Lord.

7.      The first 90 days of employment are considered by management to be an informal trial period.  During this period Mr. Blair was basically a good employee, but he had problems getting along with other employees.

8.      Mr. Lord orally cautioned Mr. Blair two times during the probationary period and recorded the underlying incidents in written reports.  On July 13, Mr. Blair and another employee was cautioned regarding a confrontation.  Ex. 200.  On July 20, Mr. Lord found Mr. Blair yelling at another employee and counseled Mr. Blair regarding his behavior.  Ex. 201.

9.      After 90 days, Mr. Blair's problems with co-workers intensified and Mr. Lord recorded additional hostile confrontations between Mr. Blair and other employees on August 10

- C07-1877RAJ
46363-003 \ 427157.doc                                                    -2-

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1   and September 1.  Exs. 202 and 203.  On September 5, Mr. Lord had to move another employee
2   off of Mr. Blair's station because Mr. Blair was snapping at him.  Mr. Lord recorded the
3   following in connection with that incident. "James is upset that he doesn't get to work with Fred
4   Davis today and is acting out.  James has a hard time working with other employees.  James
5   makes derogatory statements to others and has been warned to stop."  Ex. 204.

6        10.     Mr. Lord completed a total of five incident reports regarding Mr. Blair before a
7   first written caution was issued to Mr. Blair.  Mr. Lord testified credibly regarding the incidents
8   underlying each of these reports.

9        11.     At trial, Mr. Blair alleged that the Mr. Lord's incident reports were fabricated by
10  Alaskan Copper following Mr. Blair's termination.  Through Mr. Blair's own testimony
11  however, Alaskan Copper established that the incidents recorded in the incident reports were also
12  contemporaneously recorded by Mr. Blair in the journal that he kept while employed by Alaskan
13  Copper.  Mr. Blair then testified that he believed the union gave his journal to Alaskan Copper
14  after he provided it to the union during the grievance process, and Alaskan Copper used the
15  journal to fabricate the incident reports after his termination.  However, Alaskan Copper's
16  October 20, 2006 letter to the EEOC contained the incident reports as attachments.  Ex. 268.
17  When presented a full copy of Alaskan Copper's October 20, 2006, letter to the EEOC, Mr. Blair
18  suggested that the Stokes Lawrence law firm fraudulently attached the allegedly fabricated
19  incident reports to a copy of the letter before producing that document to him in litigation (*i.e.*,
20  he suggested that the original EEOC letter did not contain the incident reports).

21       12.     The facts do not support Mr. Blair's allegations that evidence was fabricated or
22  tampered with.  Through credible testimony of Mr. Lord and through Mr. Blair's own journal
23  entries, Alaskan Copper established contemporaneous preparation of incident reports that reflect
24  actual incidents.  Ed Cartwright credibly testified about his review of the incident reports prior to
25  subsequent discipline of Mr. Blair.  Exhibit 211 supports Mr. Cartwright's testimony.  The court
26  finds that the incident reports were prepared by Mr. Lord to record problems he was having with
27  Mr. Blair on the job, used in connection with progressive discipline and provided to the EEOC in

- C07-1877RAJ
46363-003 \ 427157.doc                                      -3-

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1   response to Mr. Blair's first EEOC charge.  The incident reports reflect Mr. Blair's repeated

2   conflict with other employees and difficulty getting along with others in the workplace.  The

3   incident reports began months before Mr. Blair ever complained about discrimination.

4           13.     Mr. Blair complained of discrimination for the first time on September 5, 2006.

5   He wrote a letter to Alaskan Copper's Human Resources Manager, Robin Murphy, and copied

6   other members of Alaskan Copper's management.  Ex. 1.

7           14.     Alaskan Copper investigated Mr. Blair's complaint and found nothing to suggest

8   discrimination.  Ms. Murphy and Operations Manager, James Brown, testified that Mr. Blair had

9   no specific examples of discrimination.  Ms. Murphy and Mr. Brown testified that Mr. Blair

10  complained that Mr. Lord favored his friends and generally mistreated everyone else.  As

11  described below, Mr. Blair's testimony at trial regarding alleged discrimination supports the

12  testimony of Ms. Murphy and Mr. Brown regarding the lack of substance contained in

13  Mr. Blair's complaints.

14          15.     After his first complaint to management, Mr. Blair's problems on the job

15  continued and Mr. Lord continued to document those problems.  Mr. Lord recorded complaints

16  from other employees and his own difficulties managing Mr. Blair.  Exs. 205-207 .  Mr. Lord

17  testified credibly at trial regarding the incidents underlying his various incident reports and

18  Mr. Blair's inability to work with any other employees.

19          16.     A number of witnesses testified credibly about Mr. Blair's inability to get along

20  with other employees.  This includes Ms. Murphy, Alaskan Copper Superintendent Ed

21  Cartwright, Mr. Lord and shop steward Anthony Britton.  The only person who appears to have

22  gotten along with Mr. Blair was Fred Davis, a long time Alaskan Copper employee who initially

23  trained Mr. Blair and was called by Mr. Blair as a witness during trial.  Mr. Davis testified about

24  Mr. Blair's inability to work with others and explained that even he could not communicate with

25  Mr. Blair as time went on.

26          17.     Mr. Blair's own testimony confirmed his inability to get along with others.  He

27  testified about problems he had with a number of other employees, black and white.  Mr. Blair

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1  testified that his confrontations with other coworkers, including black coworkers, created a

2  "hostile environment."  Mr. Blair testified that Mr. Lord created a hostile environment for him

3  when he required Mr. Blair to work with people (black and white) that he did not like.

4         18.     Mr. Blair was insubordinate to his supervisor.  Mr. Lord, Mr. Britton, Mr. Raplee

5  and Mr. Davis testified regarding their observations of Mr. Blair's insubordination.  Mr. Blair

6  admitted insubordination in his own testimony - repeatedly describing his open disrespect for his

7  supervisor.  Mr. Davis testified that plaintiff displayed anger and disrespect for Mr. Lord and that

8  he believed that this was the primary reason for the treatment that Mr. Blair received.

9         19.     On September 25, Mr. Blair wrote a second letter to Alaskan Copper

10  Management, complaining about discrimination.  The letter contained no factual detail.  Alaskan

11  Copper requested factual detail.  Mr. Blair cited discrimination in cross-training.  He told Mr.

12  Brown that no black employees were allowed to drive lift trucks.  At trial, however, Mr. Blair

13  testified that he drove lift trucks all the time, as did other black warehouse workers such as Mike

14  Jenkins.

15        20.     On September 26, shift lead Mr. Raplee received a complaint regarding Mr. Blair

16  from another African American employee, Mark Surratt.  Mr. Raplee reported the complaint to

17  Mr. Lord.  Mr. Lord testified that he spoke with Mr. Surratt and then attempted to speak with

18  Mr. Blair, who "exploded."  He yelled "Fuck the Union, Liars" etc.  He screamed and yelled at

19  Mr. Lord.  He said, "You're going to get yours" and kept calling Mr. Lord a "dog."  Mr. Lord

20  told Mr. Blair to clock out and go home to keep the situation from escalating.  Mr. Blair refused.

21  Mr. Lord told Mr. Blair that he would call the police if Mr. Blair did not leave.  Mr. Blair

22  punched out and went home 20 minutes early.

23        21.     The September 26 incident was witnessed by Mr. Britton, union steward, and by

24  Fred Davis.  Both men testified consistently with Mr. Lord.  Mr. Lord called Mr. Davis to the

25  scene because he knew that Mr. Blair got along with Mr. Davis and believed he might help to

26  diffuse the situation.  Both Mr. Britton and Mr. Lord testified that Mr. Blair was uncontrollable

27  and Mr. Lord did his best to calm him down.

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1    22.    Mr. Cartwright participated in the decision to issue a written caution in

2    connection with the September 26 incident.  Before issuing the written caution, he reviewed the

3    incident reports regarding Mr. Lord's past problems with Mr. Blair.  Although Alaskan Copper

4    could have terminated Mr. Blair for even a single incident of insubordination under its published

5    discipline policies, it did not.  Ex. 263.

6    23.    The day after Mr. Blair received the written warning, he filed his first charge with

7    the EEOC (September 29, 2006).  Ex. 9.  The charge alleged discrimination on the basis of race

8    and retaliation for his internal complaints of discrimination.  Alaskan Copper investigated the

9    charge and found no evidence to substantiate Mr. Blair's claims.  In fact, employees very clearly

10   informed Ms. Murphy that Mr. Blair was the problem in the workplace.  The September 29

11   charge was subsequently dismissed.

12   24.    On October 6, Mr. Lord had another incident of insubordination with Mr. Blair.

13   He instructed Mr. Blair to fix a mistake on an order.  Mr. Blair resisted.  After Mr. Blair finally

14   corrected the error with only one half hour left in his shift, Mr. Lord directed Mr. Blair to finish

15   the bundle he was working on before the shift ended.  When he saw Mr. Blair leaving at the end

16   of his regular midnight shift, Mr. Lord told Mr. Blair he was not finished and he would be

17   disciplined if he did not finish the bundle.  Mr. Blair left anyway.

18   25.    Mr. Blair was suspended for two days beginning October 9, 2006 for

19   insubordination and failing to follow his supervisor's instructions.  This was progressive

20   discipline pursuant to Company policy for the incident that had occurred on October 6.  The

21   disciplinary action notice was as follows:

22          At 11:10 P.M., 6 October '06, you refused to listen to your
            supervisor giving you instructions.  Then you told your supervisor
23          you would not finish your assigned work.  You were insubordinate
            and refused to complete your work prior to clocking out.
24           . . . Follow your instructions and conduct yourself in a courteous
            manner.  *Next probable action termination.*
25

26   Ex. 211 (emphasis added).

27

- C07-1877RAJ
46363-003 \ 427157.doc

-6-

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

26.     On October 9 2006, the day that Mr. Blair's suspension began, he sent a letter to Mr. Cartwright, complaining again of race discrimination.

The body of the letter reads:

> Would like to meet and talk with you about Kevin Lord. Supervisor procedures which are one-sided and unfair.  For instance, treating the black employees different than white employees.

Ex. 3.

27.     Mr. Cartwright testified that he met with Mr. Blair the following day and asked for examples of discrimination.  Mr. Blair repeated his false allegation that black employees are not allowed to drive lifts.  Mr. Blair told Mr. Cartwright that Mr. Lord favors his friends and gave an example of Mr. Lord letting Mr. Raplee come to work drunk.  The only other evidence of discrimination Mr. Blair provided to Mr. Cartwright was that "all of management is white." Mr. Cartwright is Asian.  Mr. Cartwright testified that he also knew that he had several minority supervisors.

28.     Mr. Cartwright testified regarding his investigation of Mr. Blair's claims.  Like Ms. Murphy, he discovered that employees in the warehouse, including African-American employees, thought Mr. Blair was the problem.  Mr. Cartwright concluded that Mr. Blair had significant issues getting along with other employees in the workplace.  He shared the results of his investigation with Ms. Murphy, and she shared her findings relating to her own prior investigation of Mr. Blair's first EEOC charge.  Like Ms. Murphy, Mr. Cartwright found no evidence of discrimination.  Mr. Cartwright determined that Mr. Raplee was not drinking on the job or coming to work drunk.

29.     In the Fall of 2006, Alaskan Copper conducted warehouse promotions.  The Collective Bargaining Agreement ("CBA") establishes multiple "levels" of warehouse employees, starting at "associate," going to "warehouseman," to "senior," and then to "master" with increasing hourly premiums at each stage.  Promotions were scheduled regularly to

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1   maintain company-wide ratios set by the CBA.  In the Fall of 2006 Mr. Blair, as an associate

2   warehouser, was eligible (with all other associate warehousers) for promotion to senior status.

3          30.     Mr. Lord testified regarding the promotion selection process, which was as

4   follows:  The warehouse shift supervisors from all shifts at both the Renton and Seattle locations

5   submitted evaluation sheets on every employee with 21 rating categories and a comments

6   section.  Shift supervisors did not know which level of promotions were available, nor did they

7   know the number of promotions available – generally, in their location, or on their particular

8   shift.  The superintendent (at the time, Mr. Cartwright) reviewed all evaluation forms and ranked

9   them in order.  Then he met with all of the supervisors to discuss the applicants.

10          31.     Only one employee on the second shift at the Renton Warehouse was selected for

11   promotion, Josh Desmarais.  Mr. Desmarais is white and he is younger than Mr. Blair.  At the

12   time, Mr. Lord felt that Mr. Desmarais was his best employee and more qualified for promotion

13   than anyone else on the shift.  Mr. Blair had excellent attendance and good skill scores.  He did

14   not get promoted over Mr. Desmarais because his scores were not as good and because of his

15   established inability to get along with others in the workplace.

16          32.     On December 15, Mr. Blair filed another charge with the EEOC, objecting to

17   selection of two fellow employees for promotion over him.  Ex. 10.  He added a claim of age

18   discrimination in connection with the promotion and complained of continued "harassment,

19   intimidation and discrimination because of my race and in retaliation for having filed a charge of

20   discrimination with the EEOC."  *Id*.  This second EEOC charge, like the first, was ultimately

21   dismissed.

22          33.     Mr. Blair was terminated for inadequate performance, specifically insubordination

23   and failing to follow instructions, following an incident on December 15.  His behavior on that

24   evening was consistent with a pattern of conduct that began early in his employment, intensified

25   and continued throughout.

26          34.     The final events began on the night of Friday, December 15.  Mr. Blair was

27   working at a processing station filling orders.  The published process, which Mr. Blair had

- C07-1877RAJ
46363-003 \ 427157.doc                                          -8-

1   received, requires that all orders be checked for count accuracy by a second employee after the

2   other employee fills them. This is established and documented procedure in the warehouse. On

3   the night of December 15, Mr. Blair filled an order that called for four items. He made a mistake

4   and only packed three items. After incorrectly filling the order and completing the paperwork,

5   Mr. Blair acted as his own "checker." Mike Jenkins was the driver who was set to take the order

6   to Seattle. He noticed that it was incorrectly filled and informed Mr. Raplee. Mr. Raplee was

7   the shift lead and had responsibility for quality control.

8        35.     Mr. Raplee asked Mr. Blair to fix the order and the paperwork. Mr. Blair fixed

9   the order – adding a fourth piece, but refused to fix the paperwork. He was angry and

10  aggressive. He said "Just change the three to a four, what's the big god damn deal?" and turned

11  his back and walked away from Mr. Raplee. Mr. Raplee had had a good deal of experience with

12  Mr. Blair, is a member of the bargaining unit and preferred to avoid confrontation. He decided

13  to, and did, report the matter to Mr. Lord.

14       36.     Before the second shift began on Monday, December 18, Mr. Lord contacted

15  Mr. Cartwright to advise him about what had happened. Mr. Cartwright told Lord to talk to

16  Mr. Blair about the matter. Mr. Lord did talk with Mr. Blair and reported the result in a written

17  statement:

18              I went out to James with a copy of sales order #377510 that was
                improperly filled to talk to him about his behavior on Friday
19              (12/15/06) when the lead warehouser approached him to have him
                fix the paperwork and add a piece to the bundle he made short. I
20              showed James the copy and asked him why he refused to fix the
                paperwork himself; he responded he had no idea what the hell I
21              was talking about and denied ever saying anything to the lead at
                all. At this point I described the error he made to him and he got
22              mad started swinging his arms around and said he never did that
                shit and he did use the scale. I then tried to hand James a copy of
23              the sales order and he turned his back on me and told me in a
                yelling voice I didn't do that shit, at that point I asked James to
24              calm down and stop yelling at me and listen to what I had to say. I
                pointed out on the order were [sic] James had not followed
25              instructions by one filling and checking the order himself and two
                were [sic] he had written the quantity shipped in as 3 not 4. James
26              then yelled I told you man I didn't do that fucking shit, I then told
                James to go to the break room and calm down, he laughed at me
27              turned around and walked over to the printer and continued to
                work. I followed him and told him he needed to leave the order on

- C07-1877RAJ

46363-003 \ 427157.doc

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1
2
3
4
5

> the printer and go to the break room like he asked and he said he
> would when he was done with the order he was doing.  At that
> time I let James know that if he refused to do what I asked him he
> would have to clock out and go home for not following
> instructions.  James started to walk back to his station and I asked
> him if he didn't hear me when I told him to put the order down and
> go directly to the break room, he stopped at that point stared at me
> for a moment tossed the order on the printer and stomped into the
> break room mumbling under his breath.

6   Ex. 216.

7          37.    Mr. Lord testified credibly regarding the underlying incident and the Court finds

8    that it was consistent with the contemporaneous written record.  Mr. Lord also testified  that he

9    called Mr. Britton, the shop steward, and visited Mr. Blair in the break room.  When he was

10   talking with Mr. Blair, Mr. Blair started cutting him off and raising his voice again and Mr. Lord

11   told him to go home and see Mr. Lord for his discipline action before clocking into work the next

12   day.  Mr. Britton witnessed the confrontation between Mr. Lord and Mr. Blair and testified

13   consistently.

14         38.    Mr. Lord forwarded his report to Mr. Cartwright with statements signed by

15   Mr. Raplee and another witness, Mr. Brogan.  Exs. 217-219.  After consideration by the upper

16   managers, the final step in the disciplinary progression was agreed upon.  Mr. Lord,

17   Ms. Murphy, Mr. Brown and Mr. Cartwright were involved and testified that they considered

18   Mr. Blair's work history and discipline record.  The following day, December 19, Mr. Lord gave

19   Mr. Blair was given his termination notice.  The notice stated:

20
21
22
23
24
25

> You failed to follow the instructions of your shift lead and the
> order processing instructions.  On sales order 377510 you failed to
> follow company order processing instructions by signing both the
> order 'filler' and 'check by' block which requires a second
> warehouseman/order filler.  You  also recorded the wrong quantity
> and weight.  When instructed by your lead to fix the problem you
> refused and became very confrontational and insubordinate.  You
> were approached by your supervisor for failing to follow the
> instructions of your lead and insubordinate behavior.  You
> repeatedly failed to follow your supervisor's instructions and
> became insubordinate and confrontational.  This failure to follow
> instructions and disruption of the workplace cannot be tolerated.

26   Ex. 219.

27

- C07-1877RAJ
46363-003 \ 427157.doc
-10-

39.     Mr. Blair testified that he was set up in furtherance of some kind of a conspiracy initiated by Mr. Lord and/or Mr. Cartwright, aided and abetted by Ms. Murphy, Mr. Raplee and Mr. Jenkins.  The Court finds no evidence of any such conspiracy and finds that appropriate disciplinary action was taken in response to Mr. Blair's own conduct.  Alaskan Copper's progressive discipline and termination of Mr. Blair was consistent with Company policy, which also would have supported a decision to terminate Mr. Blair for a single instance of insubordination.  Ex. 263.

**Lack of Evidence of Alleged Discrimination and/or Retaliation**

40.     Although Mr. Blair claims that he was treated differently because of his race or in retaliation for protected activity, he provided no credible evidence of discriminatory or retaliatory intent.  There are no allegations of discriminatory comments or slurs.  With respect to any action taken against him, Mr. Blair did not offer evidence that other employees were treated more favorably in similar circumstances.  In fact, Mr. Blair testified that "everybody" complained about Mr. Lord and requested assistance from the union to deal with his management style and how he was treating "everybody."  According to Mr. Blair's own testimony, Mr. Lord only favored two friends, Mr. Raplee and Josh Wallace, because they were his friends.  Other white employees did not receive the same treatment.

41.     Through the course of the trial, an as an example of Mr. Lord's alleged favoritism toward friends, Mr. Blair repeatedly alleged that Mr. Lord allowed his friend Mr. Raplee to come to work under the influence of alcohol on a regular basis.  The court finds that there is absolutely no evidence, other than the limited testimony of Mr. Blair, that Mr. Raplee ever came to work drunk or was under the influence of alcohol.  The Court finds that Mr. Blair's testimony on this issue is merely speculation, at best.  Notwithstanding that finding, the Raplee allegations are otherwise a non-issue in this case.  Mr. Blair did not testify that Mr. Lord allowed Mr. Raplee to come to work drunk because he is white and Alaskan Copper presented evidence that Mr. Lord had, in fact, terminated a white employee for drinking at work.  Mr. Blair did not testify that he,

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1   or any other African American employees, were *not* allowed come to work drunk and thus

2   treated in a disparate manner.

3       42.     Also throughout the course of the trial, Mr. Blair presented many broad theories

4   of conspiracy against Alaskan Copper, even expanded to include the law firm of Stokes

5   Lawrence, P.S. and alleged alteration or fabrication of documents.  The conspiracy theories

6   included allegations that different employees were directed or to engage in activities to harm

7   Mr. Blair or create a hostile environment for him.  The court finds that there is absolutely no

8   specific evidence to support these theories and finds related allegations unworthy of credence.

9                      **II.   CONCLUSIONS OF LAW**

10      1.     Following summary judgment, Mr. Blair had three pairs of claims under

11  analogous state and federal statutes:  Race discrimination claims, retaliation claims and hostile

12  work environment claims.  Mr. Blair had the burden of proving each of his claims by a

13  preponderance of the evidence and he did not.  Evidence presented supports judgment in favor of

14  Alaskan Copper and against Mr. Blair on each of his claims.

15              **Disparate Treatment Race Discrimination**

16      2.     Mr. Blair alleged that Alaskan Copper disciplined, failed to promote and

17  ultimately terminated him, because of his race.  He plead discrimination claims under 42 U.S.C.

18  § 2000(e) *et. seq.* ("Title VII") and RCW 49.60.180 ("WLAD").  In either case, Mr. Blair bears

19  the ultimate burden of proof:  to show by a preponderance of the evidence that a challenged

20  employment decision occurred "because of race."  *Costa v. Desert Palace, Inc.* 299 F.3d 838,

21  856-57 (9th Cir. 2002)(en banc), *aff'd*, 539 U.S. 90 (2003); and RCW 49.60.180(2); *Mackay v.*

22  *Acorn Custom Cabinetry, Inc.*, 127 Wn.2d 302, 306, 898 P.2d 284 (1995).  Under federal law, a

23  challenged employment decision is "because of race" if race was a "motivating factor" in the

24  decision.  *Id.* at 856-7.  Under Washington state law, the "substantial factor" test applies.  *See*

25  RCW 49.60.180, *Mackay*, 127 Wn.2d 302 at 307.

26      3.     Disparate treatment of similarly situated individuals can be circumstantial

27  evidence of discriminatory intent.  *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 835 (8th Cir.

**STOKES LAWRENCE, P.S.**
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

2002); *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654 (9th Cir. 2002). However, the "similarly situated" analysis is stringent. *See Moran v. Selig*, 447 F.3d 748, 754 (9th Cir. 2006) (quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53-54 (2d Cir. 2001)) (plaintiff in the protected class must be "similarly situated in all material respects" to the employees who are allegedly treated more favorably); *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004) (holding that "[t]he comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer") and *Stotts v. Memphis Fire Dept.*, 858 F.2d 289, 299 (6th Cir. 1988) (plaintiff failed to establish employer disparately punished him for fights because of his race, because plaintiff was not similarly situated with respect to white employees with less serious discipline records).

4.    Favoritism is not illegal discrimination. *Pace v. Century Gaming Management, Inc.*, 2009 WL 662086 (Cal.App.2Dist., Mar 16, 2009). In *Pace*, the court affirmed summary judgment on an employee's discrimination and retaliation claims, finding that the plaintiff's allegations of favoritism did not demonstrate discriminatory intent.

> We conclude that Pace's showing does not raise triable issues regarding whether Rosen's favoritism constituted proscribed discrimination. It is undisputed that Miller was Rosen's personal friend. As Pace acknowledged in her deposition, she did not know whether Rosen's favoritism rested on the friendship, rather than Miller's race or age. In addressing FEHA claims, California courts often look to federal cases interpreting Title VII of the Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e et seq.), which resembles FEHA in many respects. ( *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 498) Numerous federal courts have concluded that Title VII does not proscribe a supervisor's favoritism toward an employee based solely on a friendship or other intimate relationship, even when the favoritism disadvantages someone within a protected class.

*Id.*, *10 *citing Brandt v. Shop 'N Save Warehouse Foods, Inc.* 108 F.3d 935, 938 (8th Cir. 1997) ("[I]t is not intentional sex discrimination for [a supervisor] to hire an unemployed old friend who happens to be male, without considering an applicant who is neither unemployed nor an old friend and happens to be female."); *Foster v. Dalton*, 71 F.3d 52, 54, 56 (1st Cir. 1995) (race discrimination claim failed in light of evidence supervisor altered job description solely to favor

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

"fishing buddy"); *Holder v. City of Raleigh*, 867 F.2d 823, 826 (4th Cir. 1989) (race discrimination claim failed in light of findings that supervisor engaged only in nepotism in hiring son to fill position).

5.      The Court concludes that Mr. Blair has not proven that race was even a partial motivation for any of the adverse employment actions he was subjected to.  There is no evidence of racially discriminatory comments or slurs.  There is no evidence that similarly situated non-minority employees were treated differently than Mr. Blair on any occasion or generally.  The testimony of all the witnesses and the documentary evidence they reviewed show instead that any adverse employment actions were the result of Mr. Blair's work performance, primarily his difficulty getting along with his co-workers and his supervisors.

## Retaliation

6.      Mr. Blair alleged that Alaskan Copper disciplined, failed to promote, and ultimately terminated him, in retaliation for his discrimination complaints.  He plead retaliation claims under 42 U.S.C § 2000(e) ("Title VII") and RCW 49.60.210(1) ("WLAD").  To prove retaliation, Mr. Blair must establish (1) that he engaged in or was engaging in a statutorily protected activity under federal law, (2) that the Alaskan Copper subjected Mr. Blair to an adverse employment action; and (3) that Mr. Blair was subjected to the adverse employment action because of his engagement in protected activity.  *Raad v. Fairbanks North Star Borough Sch. Dist.*, 323 F.3d 1185, 1196-97 (9th Cir.2003);  *Allison v. Housing Authority of Seattl*e, 118 Wn.2d 79, 96, 821 P.2d 34 (1991) Under federal law, he must prove that his engagement in protected activity was at least a motivating factor for any adverse action.  *Stegall v. Citadel Broad. Co*. 350 F.3d 1061, 1067-68 (9th Cir. 2004).  Under state law, he must prove that his engagement in protected activity was a substantial factor.  *Schonauer v. DCR Entertainment, Inc.*, 79 Wn. App. 808, 827, 905 P.2d 392 (1995), *citing Allison*, 118 Wn.2d at 96, and *Delahunty v. Cahoon*, 66 Wn. App. 829, 832 P.2d 1378 (1992).

**STOKES LAWRENCE, P.S.**
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1    7.    The evidence is clear that Mr. Blair filed at least three EEOC complaints and the

2    Court finds that filing those complaints is a protected activity.  However, based upon the totality

3    of the evidence presented at trial, Mr. Blair did not prove that Alaskan Copper took any action

4    against him, either entirely or in part, because he filed EEOC complaints or made other internal

5    complaints about discrimination.  Instead, the court credits the testimony of many witnesses who

6    testified that the reason for the actions they took against Mr. Blair was his unprotected conduct,

7    not his discrimination complaints.  Testimony of non-decision makers regarding their

8    observation of Mr. Blair in the workplace only corroborates decision maker testimony.  In fact, if

9    anything, the evidence reflects that individuals allegedly taking action were either unaware of the

10   existence of the complaints, or that discipline occurred prior to his complaints.  The record

11   reflects fair discipline progressively applied to correct a continued pattern of performance issues

12   that began long before any discrimination complaints were made by Mr. Blair, to the EEOC or

13   otherwise.  Protected activity was not a motivating or substantial factor in any adverse

14   employment action.

15                                   **Hostile Work Environment**

16   8.    Mr. Blair claims that he was subject to a hostile work environment based upon his

17   race and/or his protected activity (i.e. discrimination complaints).  He plead the same claim

18   under analogous federal and state statutes, 42 U.S.C. § 2000(e), *et seq.*, ("Title VII") and

19   RCW 49.60.180(3) ("WLAD").

20   9.    To prevail on his hostile work environment claims, Mr. Blair must establish that

21   (1) he was subjected to verbal or physical conduct because of his race or protected activity;

22   (2) the conduct was unwelcome; (3) the conduct was sufficiently severe or pervasive to alter the

23   conditions of his employment and create a racially abusive work environment. *Fuller v. City of*

24   *Oakland, California*, 47 F.3d 1522, 1527 (9th Cir. 1995); *Manatt v. Bank of America*, 339 F.3d

25   792, 798 (9th Cir. 2003) (citing *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 817 (9th Cir. 2002));

26   *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004) (conduct must be extreme,

27   creating a work environment that is both subjectively and objectively hostile, from the

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1   perspective of a reasonable person of the plaintiff's protected class).  These elements are the

2   same under Washington State law.  *Glasgow v. Georgia-Pacific Corp.*, 103 Wn.2d 401, 406-407,

3   693 P.2d 708 (1985).

4          10.     Mr. Blair presented no evidence that he was subjected to any conduct because of

5   his race or any protected activity.  He presented no evidence that he was subjected to conduct

6   that was subjectively or objectively hostile because of the fact that he is African-American.

7   Mr. Blair testified that his supervisor made him sign documents and forced him to work with

8   people with whom he did not want to work.  He testified that Mr. Lord was a bad supervisor and

9   that he had a hostile management style that led to complaints by "everybody."  There is no

10  evidence of any racial comments or slurs, or that any verbal or physical conduct directed from

11  Mr. Lord to Mr. Blair was motivated by any impermissible factor.  To the contrary, Mr. Lord's

12  actions were job-related and consistently applied to all employees on Mr. Lord's shift.

13         11.     The "hostile environment" about which Mr. Blair complains also includes

14  confrontations with virtually every other employee on his shift, including black employees.

15  Mr. Blair suggests that these confrontations may have been orchestrated by Mr. Lord as a form

16  of harassment.  Mr. Blair's inability to get along with others was well established at trial.  There

17  is no evidence to connect Mr. Lord to anything that any of Mr. Blair's coworkers may have said

18  or done to him.  Finally, there is no evidence that any co-worker conduct was racially motivated

19  or motivated by retaliatory animus.  Mr. Blair's conflicts resulted from his own attitude and non-

20  protected behavior and had nothing to do with his race or any other impermissible factor.

21

22

23

24

25

26

27

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1

2                                **III.     Judgment**

3          The Court directs the Clerk to enter Judgment pursuant to Federal Rule of Civil

4    Procedure 58.

5          DATED this _____ day of May, 2009.

6

7                                              _____

8                                              The Honorable Richard A. Jones

9

10   Presented By:

     STOKES LAWRENCE, P.S.
11

12

13   By: /s/ Chris Farias_____
        Chris Farias (WSBA #21743)
14      Brendan Monahan (WSBA #22315)
     Attorneys for Defendant Alaskan Copper
     and Brass Co.
15

16

17

18

19

20

21

22

23

24

25

26

27

**STOKES LAWRENCE, P.S.**
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1

## CERTIFICATE OF SERVICE

2

3

I hereby certify that on May 22, 2009, I caused the foregoing *Findings of Fact and Conclusions of Law and Direction for Entry of Judgment* to be:

4

☐   electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

5

6

7

☐   mailed by first class United States mail, postage prepaid, to the following:

8

9

☒   hand delivered to the following:

10

James M. Blair
621 S King Street, #522
Seattle, WA 98104

11

12

13

☐   e-mailed and mailed by first class United States mail, postage prepaid, to the following:

14

15

16

☐   faxed and mailed by first class United States mail, postage prepaid, to the following:

17

18

19

/s/ Chris Farias

20

Chris Farias (WSBA #21743)
Attorney for Defendant
Stokes Lawrence, P.S.
800 Fifth Avenue, Suite 4000
Seattle, WA  98104
(206) 626-6000
Fax:  (206) 464-1496
chris.farias@stokeslaw.com

21

22

23

24

25

26

27

- C07-1877RAJ
46363-003 \ 427157.doc

-18-