HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JAMES M. BLAIR,

    Plaintiff,

v.

ALASKAN COPPER AND BRASS CO.,

    Defendant.

Case No.: C07-1877RAJ

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND DIRECTION FOR ENTRY OF JUDGMENT

This matter came on for bench trial beginning Monday, April 27, 2009. Plaintiff James Blair appeared *pro se*. Defendant Alaskan Copper & Brass Co. ("Alaskan Copper") was represented by Brendan Monahan of Stokes Lawrence, P.S. At the close of Mr. Blair's case and following three days of testimony, Alaskan Copper moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c). Being fully advised, the Court granted Alaskan Copper's Rule 56(c) motion. The court has adopted many of the proposed findings of fact and conclusions of law (Dkt. # 110) submitted by Alaskan Copper at the conclusion of the bench trial.

## I. FINDINGS OF FACT

### Background

1.     Alaskan Copper is a Seattle-based metal materials supply business. The Company fills orders from a warehouse in Renton, Washington. Mr. Blair was hired to work in

the Renton warehouse on May 9, 2006.  Mr. Blair was terminated by Alaskan Copper on December 18, 2006.

2. During the course of his employment, Mr. Blair filed two EEOC Charges.  The first alleged race discrimination and hostile work environment.  The second alleged race and age discrimination, retaliation and hostile work environment.  Following his termination, Mr. Blair filed a third EEOC charge which alleged race and age discrimination, retaliation and hostile work environment.  All three charges were dismissed by the EEOC.

3. Following his termination, Mr. Blair filed a labor grievance to contest his termination.  He was represented by his Union in the arbitration hearing.

4. Subsequently, Mr. Blair filed this lawsuit.  He alleged race and age discrimination, retaliation, hostile work environment and "whistleblowing."  Alaskan Copper moved for summary judgment.  On April 9, 2009, the court granted summary judgment against Mr. Blair's age and whistleblowing claims and found that remaining claims survived for trial. Dkt # 85.

## Mr. Blair's Employment, Discipline and Termination

5. When Mr. Blair was hired at Alaskan Copper, he was assigned to work the second shift in a crew of 11 employees under the supervision of Kevin Lord.

6. The first 90 days of employment are considered by management to be an informal trial period.  During this period Mr. Blair was basically a good employee, but he had problems getting along with other employees.

7. Mr. Lord orally cautioned Mr. Blair two times during the probationary period and recorded the underlying incidents in written reports.  On July 13, Mr. Blair and another employee was cautioned regarding a confrontation.  Ex. 200.  On July 20, Mr. Lord found Mr. Blair yelling at another employee and counseled Mr. Blair regarding his behavior.  Ex. 201.

8. After 90 days, Mr. Blair's problems with co-workers intensified and Mr. Lord recorded additional hostile confrontations between Mr. Blair and other employees on August 10 and September 1.  Exs. 202 and 203.  On September 5, Mr. Lord had to move another employee

FINDINGS OF FACT AND CONCLUSIONS OF LAW
-2-

off of Mr. Blair's station because Mr. Blair was snapping at him. Mr. Lord recorded the following in connection with that incident. "James is upset that he doesn't get to work with Fred Davis today and is acting out. James has a hard time working with other employees. James makes derogatory statements to others and has been warned to stop." Ex. 204.

9. Mr. Lord completed a total of five incident reports regarding Mr. Blair before a first written caution was issued to Mr. Blair.

10. At trial, Mr. Blair testified that the Mr. Lord's incident reports were fabricated by Alaskan Copper following Mr. Blair's termination, and that Alaskan Copper's counsel also fabricated letters to the EEOC from Alaskan Copper with the incident reports as attachments. The court finds Mr. Blair's testimony in this regard wholly incredible, and notes that much objective evidence establishes that Mr. Lord prepared the incident reports more or less contemporaneously with the recorded incidents.

11. Mr. Blair complained of discrimination for the first time on September 5, 2006. He wrote a letter to Alaskan Copper's Human Resources Manager, Robin Murphy, and copied other members of Alaskan Copper's management. Ex. 1.

12. Alaskan Copper investigated Mr. Blair's complaint and found nothing to suggest discrimination. Ms. Murphy and Operations Manager, James Brown, testified that Mr. Blair had no specific examples of discrimination. Ms. Murphy and Mr. Brown testified that Mr. Blair complained that Mr. Lord favored his friends and generally mistreated everyone else. As described below, Mr. Blair's testimony at trial regarding alleged discrimination supports the testimony of Ms. Murphy and Mr. Brown regarding the lack of substance contained in Mr. Blair's complaints.

13. After his first complaint to management, Mr. Blair's problems on the job continued and Mr. Lord continued to document those problems. Mr. Lord recorded complaints from other employees and his own difficulties managing Mr. Blair. Exs. 205-207 . Mr. Lord testified credibly at trial regarding the incidents underlying his various incident reports and Mr. Blair's inability to work with any other employees.

14. A number of witnesses testified credibly about Mr. Blair's inability to get along with other employees. This includes Ms. Murphy, Alaskan Copper Superintendent Ed Cartwright, Mr. Lord and shop steward Anthony Britton. The only person who appears to have gotten along with Mr. Blair was Fred Davis, a long time Alaskan Copper employee who initially trained Mr. Blair and was called by Mr. Blair as a witness during trial. Mr. Davis testified about Mr. Blair's inability to work with others and explained that even he could not communicate with Mr. Blair as time went on.

15. Mr. Blair's own testimony confirmed his inability to get along with others. He testified about problems he had with a number of other employees, black and white. Mr. Blair testified that his confrontations with other coworkers, including black coworkers, created a "hostile environment." Mr. Blair testified that Mr. Lord created a hostile environment for him when he required Mr. Blair to work with people (black and white) that he did not like.

16. Mr. Blair was insubordinate to his supervisor. Mr. Lord, Mr. Britton, Mr. Raplee and Mr. Davis testified regarding their observations of Mr. Blair's insubordination. Mr. Blair admitted insubordination in his own testimony - repeatedly describing his open disrespect for his supervisor. Mr. Davis testified that plaintiff displayed anger and disrespect for Mr. Lord and that he believed that this was the primary reason for the treatment that Mr. Blair received.

17. On September 25, Mr. Blair wrote a second letter to Alaskan Copper Management, complaining about discrimination. The letter contained no factual detail. Alaskan Copper requested factual detail. Mr. Blair cited discrimination in cross-training. He told Mr. Brown that no black employees were allowed to drive lift trucks. At trial, however, Mr. Blair admitted that he drove lift trucks, as did other black warehouse workers such as Mike Jenkins.

18. On September 26, shift lead Mr. Raplee received a complaint regarding Mr. Blair from another African American employee, Mark Surratt. Mr. Raplee reported the complaint to Mr. Lord. Mr. Lord testified that he spoke with Mr. Surratt and then attempted to speak with Mr. Blair, who "exploded." He yelled "Fuck the Union, Liars" etc. He screamed and yelled at Mr. Lord. He said, "You're going to get yours" and kept calling Mr. Lord a "dog." Mr. Lord

1  told Mr. Blair to clock out and go home to keep the situation from escalating. Mr. Blair refused.
2  Mr. Lord told Mr. Blair that he would call the police if Mr. Blair did not leave. Mr. Blair
3  punched out and went home 20 minutes early.

19. The September 26 incident was witnessed by Mr. Britton, union steward, and by Fred Davis. Both men testified consistently with Mr. Lord.

20. Mr. Cartwright participated in the decision to issue a written caution in connection with the September 26 incident. Before issuing the written caution, he reviewed the incident reports regarding Mr. Lord's past problems with Mr. Blair.

21. The day after Mr. Blair received the written warning, he filed his first charge with the EEOC (September 29, 2006). Ex. 9. The charge alleged discrimination on the basis of race and retaliation for his internal complaints of discrimination. Alaskan Copper investigated the charge and found no evidence to substantiate Mr. Blair's claims. The EEOC ultimately dismissed the charge.

22. On October 6, Mr. Lord had another incident of insubordination with Mr. Blair. He instructed Mr. Blair to fix a mistake on an order. Mr. Blair resisted. After Mr. Blair finally corrected the error with only one half hour left in his shift, Mr. Lord directed Mr. Blair to finish the bundle he was working on before the shift ended. When he saw Mr. Blair leaving at the end of his regular midnight shift, Mr. Lord told Mr. Blair he was not finished and he would be disciplined if he did not finish the bundle. Mr. Blair left anyway.

23. Mr. Blair was suspended for two days beginning October 9, 2006 for insubordination and failing to follow his supervisor's instructions. This was progressive discipline pursuant to Company policy for the incident that had occurred on October 6. The disciplinary action notice was as follows:

> At 11:10 P.M., 6 October '06, you refused to listen to your supervisor giving you instructions. Then you told your supervisor you would not finish your assigned work. You were insubordinate and refused to complete your work prior to clocking out.
> . . . Follow your instructions and conduct yourself in a courteous manner. *Next probable action termination*.

Ex. 211 (emphasis added).

24. On October 9 2006, the day that Mr. Blair's suspension began, he sent a letter to Mr. Cartwright, complaining again of race discrimination.

The body of the letter reads:

> Would like to meet and talk with you about Kevin Lord. Supervisor procedures which are one-sided and unfair. For instance, treating the black employees different than white employees.

Ex. 3.

25. Mr. Cartwright testified that he met with Mr. Blair the following day and asked for examples of discrimination. At the time, Mr. Blair asserted that black employees were not allowed to drive lifts, an assertion that he admitted was not true at trial. Mr. Blair told Mr. Cartwright that Mr. Lord favors his friends and gave an example of Mr. Lord letting Mr. Raplee come to work drunk. The only other evidence of discrimination Mr. Blair provided to Mr. Cartwright was that "all of management is white." Mr. Cartwright is Asian. Mr. Cartwright testified that he also knew that Alaskan Copper had several minority supervisors.

26. Mr. Cartwright testified regarding his investigation of Mr. Blair's claims. Like Ms. Murphy, he discovered that employees in the warehouse, including African-American employees, thought Mr. Blair was the problem. Mr. Cartwright concluded that Mr. Blair had significant issues getting along with other employees in the workplace. He shared the results of his investigation with Ms. Murphy, and she shared her findings relating to her own prior investigation of Mr. Blair's first EEOC charge. Like Ms. Murphy, Mr. Cartwright found no evidence of discrimination. Mr. Cartwright determined that Mr. Raplee was not drinking on the job or coming to work drunk.

27. In the Fall of 2006, Alaskan Copper conducted warehouse promotions. The Collective Bargaining Agreement ("CBA") establishes multiple "levels" of warehouse employees, starting at "associate," going to "warehouseman," to "senior," and then to "master" with increasing hourly premiums at each stage. Promotions were scheduled regularly to

maintain company-wide ratios set by the CBA.  In the Fall of 2006 Mr. Blair, as an associate warehouser, was eligible (with all other associate warehousers) for promotion to senior status.

28. Mr. Lord testified regarding the promotion selection process, which was as follows: The warehouse shift supervisors from all shifts at both the Renton and Seattle locations submitted evaluation sheets on every employee with 21 rating categories and a comments section.  Shift supervisors did not know which level of promotions were available, nor did they know the number of promotions available – generally, in their location, or on their particular shift.  The superintendent (at the time, Mr. Cartwright) reviewed all evaluation forms and ranked them in order.  Then he met with all of the supervisors to discuss the applicants.

29. Only one employee on the second shift at the Renton Warehouse was selected for promotion, Josh Desmarais.  Mr. Desmarais is white.  At the time, Mr. Lord felt that Mr. Desmarais was his best employee and more qualified for promotion than anyone else on the shift.  Mr. Blair had excellent attendance and good skill scores.  He did not get promoted over Mr. Desmarais because his scores were not as good and because of his established inability to get along with others in the workplace.

30. On December 15, Mr. Blair filed another charge with the EEOC, objecting to selection of two fellow employees for promotion over him.  Ex. 10.  He complained of continued "harassment, intimidation and discrimination because of my race and in retaliation for having filed a charge of discrimination with the EEOC."  *Id*.  This second EEOC charge, like the first, was ultimately dismissed.

31. Mr. Blair was terminated for inadequate performance, specifically insubordination and failing to follow instructions, following an incident on December 15, 2006.

32. The final events began on the night of Friday, December 15.  Mr. Blair was working at a processing station filling orders.  The published process, which Mr. Blair had received, requires that all orders be checked for count accuracy by a second employee after the other employee fills them.  This is established and documented procedure in the warehouse.  On the night of December 15, Mr. Blair filled an order that called for four items.  He made a mistake

and only packed three items. After incorrectly filling the order and completing the paperwork, Mr. Blair acted as his own "checker." Mike Jenkins was the driver who was set to take the order to Seattle. He noticed that it was incorrectly filled and informed Mr. Raplee. Mr. Raplee was the shift lead and had responsibility for quality control.

33. Mr. Raplee asked Mr. Blair to fix the order and the paperwork. Mr. Blair fixed the order – adding a fourth piece, but refused to fix the paperwork. He was angry and aggressive. He said "Just change the three to a four, what's the big god damn deal?" and turned his back and walked away from Mr. Raplee. Mr. Raplee reported the matter to Mr. Lord.

34. Before the second shift began on Monday, December 18, Mr. Lord contacted Mr. Cartwright to advise him about what had happened on December 15. Mr. Cartwright told Mr. Lord to talk to Mr. Blair about the matter. Mr. Lord spoke with Mr. Blair and reported the result in a written statement:

> I went out to James with a copy of sales order #377510 that was improperly filled to talk to him about his behavior on Friday (12/15/06) when the lead warehouser approached him to have him fix the paperwork and add a piece to the bundle he made short. I showed James the copy and asked him why he refused to fix the paperwork himself; he responded he had no idea what the hell I was talking about and denied ever saying anything to the lead at all. At this point I described the error he made to him and he got mad started swinging his arms around and said he never did that shit and he did use the scale. I then tried to hand James a copy of the sales order and he turned his back on me and told me in a yelling voice I didn't do that shit, at that point I asked James to calm down and stop yelling at me and listen to what I had to say. I pointed out on the order were [sic] James had not followed instructions by one filling and checking the order himself and two were [sic] he had written the quantity shipped in as 3 not 4. James then yelled I told you man I didn't do that fucking shit, I then told James to go to the break room and calm down, he laughed at me turned around and walked over to the printer and continued to work. I followed him and told him he needed to leave the order on the printer and go to the break room like he asked and he said he would when he was done with the order he was doing. At that time I let James know that if he refused to do what I asked him he would have to clock out and go home for not following instructions. James started to walk back to his station and I asked him if he didn't hear me when I told him to put the order down and go directly to the break room, he stopped at that point stared at me for a moment tossed the order on the printer and stomped into the break room mumbling under his breath.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Ex. 216.

35. Mr. Lord testified credibly regarding the underlying incident and the Court finds that it was consistent with the contemporaneous written record. Mr. Lord also testified that he called Mr. Britton, the shop steward, and visited Mr. Blair in the break room. When he was talking with Mr. Blair, Mr. Blair started cutting him off and raising his voice again and Mr. Lord told him to go home and see Mr. Lord for his discipline action before clocking into work the next day. Mr. Britton witnessed the confrontation between Mr. Lord and Mr. Blair and testified consistently.

36. Mr. Lord forwarded his report to Mr. Cartwright with statements signed by Mr. Raplee and another witness, Mr. Brogan. Exs. 217-219. After consideration by the upper managers, the final step in the disciplinary progression was agreed upon. Mr. Lord, Ms. Murphy, Mr. Brown and Mr. Cartwright were involved and testified that they considered Mr. Blair's work history and discipline record. The following day, December 19, Mr. Lord gave Mr. Blair was given his termination notice. The notice stated:

> You failed to follow the instructions of your shift lead and the order processing instructions. On sales order 377510 you failed to follow company order processing instructions by signing both the order 'filler' and 'check by' block which requires a second warehouseman/order filler. You also recorded the wrong quantity and weight. When instructed by your lead to fix the problem you refused and became very confrontational and insubordinate. You were approached by your supervisor for failing to follow the instructions of your lead and insubordinate behavior. You repeatedly failed to follow your supervisor's instructions and became insubordinate and confrontational. This failure to follow instructions and disruption of the workplace cannot be tolerated.

Ex. 219.

37. Mr. Blair's testimony about the December 15 incident and its aftermath was that Mr. Lord and/or Mr. Cartwright had modified his correct work order and confronted him about it in an effort to manufacture a disciplinary incident, and that they were aided and abetted by Ms. Murphy, Mr. Raplee and Mr. Jenkins. The Court finds Mr. Blair's testimony incredible, and

finds that the consistent testimony of numerous Alaskan Copper witnesses was credible as to the incident.

### Lack of Evidence of Alleged Discrimination and/or Retaliation

38. Although Mr. Blair claims that he was treated differently because of his race or in retaliation for protected activity, he provided no credible evidence of discriminatory or retaliatory conduct. With respect to any action taken against him, Mr. Blair did not offer evidence that other employees were treated more favorably in similar circumstances, much less that any action taken against him was motivated by his race or his protected employment activity.

39. Through the course of the trial, an as an example of Mr. Lord's alleged preference for white workers, Mr. Blair repeatedly alleged that Mr. Lord allowed his friend Mr. Raplee to come to work under the influence of alcohol. The court finds that there is no evidence, other than the testimony of Mr. Blair, that Mr. Raplee ever came to work drunk or under the influence of alcohol. The Court finds that Mr. Blair's testimony on this issue is speculation, at best. Mr. Blair did not testify that he, or any other African American employees, or any other employees who had made workplace discrimination complaints, were *not* allowed come to work drunk and thus treated in a disparate manner.

### II. CONCLUSIONS OF LAW

1. At trial, Mr. Blair presented three pairs of claims under analogous state and federal statutes: Race discrimination claims, retaliation claims and hostile work environment claims. Mr. Blair had the burden of proving each of his claims by a preponderance of the evidence.

### Disparate Treatment Race Discrimination

2. Mr. Blair alleged that Alaskan Copper disciplined, failed to promote and ultimately terminated him, because of his race. He plead discrimination claims under 42 U.S.C. § 2000(e) *et. seq.* ("Title VII") and RCW 49.60.180 ("WLAD"). In either case, Mr. Blair bears the ultimate burden of proof: to show by a preponderance of the evidence that a challenged

FINDINGS OF FACT AND CONCLUSIONS OF LAW

employment decision occurred "because of race." *Costa v. Desert Palace, Inc*. 299 F.3d 838, 856-57 (9th Cir. 2002)(en banc), *aff'd*, 539 U.S. 90 (2003); and RCW 49.60.180(2); *Mackay v. Acorn Custom Cabinetry, Inc*., 127 Wn.2d 302, 306, 898 P.2d 284 (1995). Under federal law, a challenged employment decision is "because of race" if race was a "motivating factor" in the decision. *Id*. at 856-7. Under Washington state law, the "substantial factor" test applies. *See* RCW 49.60.180, *Mackay*, 127 Wn.2d 302 at 307.

3. Disparate treatment of similarly situated individuals can be circumstantial evidence of discriminatory intent. *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 835 (8th Cir. 2002); *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654 (9th Cir. 2002). However, the "similarly situated" analysis is stringent. *See Moran v. Selig*, 447 F.3d 748, 754 (9th Cir. 2006) (quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53-54 (2d Cir. 2001)) (plaintiff in the protected class must be "similarly situated in all material respects" to the employees who are allegedly treated more favorably); *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004) (holding that "[t]he comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer") and *Stotts v. Memphis Fire Dept.*, 858 F.2d 289, 299 (6th Cir. 1988) (plaintiff failed to establish employer disparately punished him for fights because of his race, because plaintiff was not similarly situated with respect to white employees with less serious discipline records).

4. The Court concludes that Mr. Blair has not proven that race was even a partial motivation for any of the adverse employment actions he was subjected to. There is no evidence of racially discriminatory comments or slurs. There is no evidence that similarly situated non-minority employees were treated differently than Mr. Blair on any occasion or generally. The testimony of all the witnesses and the documentary evidence they reviewed show instead that any adverse employment actions were the result of Mr. Blair's work performance, primarily his difficulty getting along with his co-workers and his supervisors.

**Retaliation**

5.  Mr. Blair alleged that Alaskan Copper disciplined, failed to promote, and ultimately terminated him, in retaliation for his discrimination complaints. He plead retaliation claims under 42 U.S.C § 2000(e) ("Title VII") and RCW 49.60.210(1) ("WLAD"). To prove retaliation, Mr. Blair must establish (1) that he engaged in or was engaging in a statutorily protected activity under federal law, (2) that the Alaskan Copper subjected Mr. Blair to an adverse employment action; and (3) that Mr. Blair was subjected to the adverse employment action because of his engagement in protected activity. *Raad v. Fairbanks North Star Borough Sch. Dist.*, 323 F.3d 1185, 1196-97 (9th Cir.2003); *Allison v. Housing Authority of Seattle*, 118 Wn.2d 79, 96, 821 P.2d 34 (1991). Under federal law, he must prove that his engagement in protected activity was at least a motivating factor for any adverse action. *Stegall v. Citadel Broad. Co*. 350 F.3d 1061, 1067-68 (9th Cir. 2004). Under state law, he must prove that his engagement in protected activity was a substantial factor. *Schonauer v. DCR Entertainment, Inc.*, 79 Wn. App. 808, 827, 905 P.2d 392 (1995), *citing Allison*, 118 Wn.2d at 96, and *Delahunty v. Cahoon*, 66 Wn. App. 829, 832 P.2d 1378 (1992).

6.  Mr. Blair filed at least three EEOC complaints and the Court finds that filing those complaints is a protected activity. However, based upon the totality of the evidence presented at trial, Mr. Blair did not prove that Alaskan Copper took any action against him, either entirely or in part, because he filed EEOC complaints or made other internal complaints about discrimination. Instead, the court credits the testimony of many witnesses who testified that the reason for the actions they took against Mr. Blair was his unprotected conduct, not his discrimination complaints. Testimony of non-decision makers regarding their observation of Mr. Blair in the workplace only corroborates decision maker testimony. In fact, if anything, the evidence reflects that individuals allegedly taking action were either unaware of the existence of the complaints, or that discipline occurred prior to his complaints. Protected activity was not a motivating or substantial factor in any adverse employment action.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
-12-

## Hostile Work Environment

7. Mr. Blair claims that he was subject to a hostile work environment based upon his race and/or his protected activity (i.e. discrimination complaints). He plead the same claim under analogous federal and state statutes, 42 U.S.C. § 2000(e), *et seq.*, ("Title VII") and RCW 49.60.180(3) ("WLAD").

8. To prevail on his hostile work environment claims, Mr. Blair must establish that (1) he was subjected to verbal or physical conduct because of his race or protected activity; (2) the conduct was unwelcome; (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create a racially abusive work environment. *Fuller v. City of Oakland, California*, 47 F.3d 1522, 1527 (9th Cir. 1995); *Manatt v. Bank of America*, 339 F.3d 792, 798 (9th Cir. 2003) (citing *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 817 (9th Cir. 2002)); *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004) (conduct must be extreme, creating a work environment that is both subjectively and objectively hostile, from the perspective of a reasonable person of the plaintiff's protected class). These elements are the same under Washington State law. *Glasgow v. Georgia-Pacific Corp.*, 103 Wn.2d 401, 406-407, 693 P.2d 708 (1985).

9. Mr. Blair presented no evidence that he was subjected to any conduct because of his race or any protected activity. He presented no evidence that he was subjected to conduct that was subjectively or objectively hostile because of the fact that he is African-American. Mr. Blair testified that his supervisor made him sign documents and forced him to work with people with whom he did not want to work. He testified that Mr. Lord was a bad supervisor and that he had a hostile management style that led to complaints by "everybody." There is no evidence of any racial comments or slurs, or that any verbal or physical conduct directed from Mr. Lord to Mr. Blair was motivated by any impermissible factor. To the contrary, Mr. Lord's actions were job-related and consistently applied to all employees on Mr. Lord's shift. The "hostile environment" about which Mr. Blair complains also includes confrontations with virtually every other employee on his shift, including black employees. Mr. Blair suggests that

these confrontations may have been orchestrated by Mr. Lord as a form of harassment. Mr. Blair's inability to get along with others was well established at trial. There is no evidence to connect Mr. Lord to anything that any of Mr. Blair's coworkers may have said or done to him. Finally, there is no evidence that any co-worker conduct was racially motivated or motivated by retaliatory animus. Mr. Blair's conflicts resulted from his own attitude and non-protected behavior and had nothing to do with his race or any other impermissible factor.

### III. Judgment

The Court directs the Clerk to enter Judgment for Alaskan Copper.

DATED this 10th day of July, 2009.

*Richard A. Jones*

The Honorable Richard A. Jones
United States District Judge